**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION**

UNITED STATES OF AMERICA,

     v.

BRETT DONOVAN BUSSEY,

       Defendant.

CASE NO.: 5:21-cr-9

## REPORT AND RECOMMENDATION

Defendant Bussey filed a Motion to Suppress the November 16, 2021 Search of 410 West 6th Street, Tifton, Georgia, and Computers and Electronic Devices.  Doc. 694.  This matter is fully briefed.  Docs. 886, 941.  I held a hearing on this Motion.  See Doc. 1133 (hearing transcript).  Bussey's counsel and counsel for the Government appeared at the hearing, and the parties provided additional argument and evidence.  Id.  For the following reasons, I **RECOMMEND** the Court **DENY** Bussey's Motion to Suppress, including Bussey's request for a Franks hearing.

This Motion is one of three motions to suppress Bussey filed in this case.  In one motion, Bussey challenged a wiretap order.  Doc. 651.  I issued my Report and Recommendation, recommending that the Court deny the motion.  Doc. 1202.  In another motion, Bussey challenged a warrant to search his Microsoft email account.  I recommended the Court deny that motion, as well.  Doc. 1218.  In this Motion, Bussey challenges a warrant to search his residence.  Doc. 694.

The warrant application Bussey challenges in this Motion was supported by a 159-page affidavit that identified 22 Target Locations.  The affidavit listed Bussey's residence as Target

Location 12.  Doc. 694-3.  Two additional documents are relevant to this Motion.  Attachment

A-12 described Bussey's residence, Target Location 12, in detail.  Doc. 694-2 at 2.  Attachment

B described the items to be seized from all 22 Target Locations.  Doc. 694-2 at 5.  Bussey

challenges the warrant as it applies to Target Location 12.  Bussey argues the warrant was not

particularized enough to satisfy the Fourth Amendment.  As part of that argument, Bussey claims

neither Attachment A-12 nor Attachment B were incorporated into the warrant.  Even if these

documents were incorporated, Bussey argues the warrant still was not particularized enough.

Lastly, Bussey argues the affidavit contained misstatements and omissions.  Bussey claims that,

if corrected, the affidavit would not support probable cause to search Target Location 12.

Doc. 694.  As explained below, Bussey's challenges fail.

## BACKGROUND

On November 16, 2021, Special Agent Kelly Linemann of the U.S. Department of

Labor's Office of the Inspector General ("Agent Linemann") applied for a warrant to search the

premises of 410 West 6th Street, Tifton, Georgia.  Doc. 694-1.  The warrant application stated

"See Attachment A-12" in the field for identification of the premises, which identified 410 West

6th Street Tifton, Georgia 31794 as Location 12.  The warrant application stated "See

Attachment B" in the field for description of the property to be seized.  The warrant application

stated "See Attached Affidavit" in the field for the facts supporting the application.  The

Honorable Charles H. Weigle, a United States Magistrate Judge in the Middle District of

Georgia, authorized the warrant on November 16, 2021.  Id.

## I.    The Affidavit

In this Section, I provide a summary of Agent Linemann's affidavit, including all

information relevant to Bussey and the instant Motion.  The affidavit is 159 pages long and

identifies 22 Target Locations, 24 criminal defendants, and 39 Target Subjects. Agents used the affidavit to support numerous warrant applications. I do not include information concerning many of the other target locations, defendants, and target subjects. I restate the affidavit's factual allegations as Agent Linemann presented them, but I do not adopt any of those factual allegations as true.

### A.    The Alleged Criminal Organization

Agent Linemann's affidavit identified several individuals as members of an alleged transnational criminal organization ("TCO") that fraudulently used the H-2A visa program. Members of the TCO used the program to "smuggle foreign nationals . . . under the pretext of being an agricultural laborer" and to "make money by exploiting these foreign workers" and laundering the illegal proceeds. Doc. 694-3 ¶¶ 24–27. TCO members engaged in conspiracy to commit mail fraud, conspiracy to engage in forced labor, and conspiracy to commit money laundering (the "Target Offenses"). Id. at ¶ 8 (alleging violations of 18 U.S.C. §§ 1349, 1594, and 1956(h), respectively).

Members of the TCO "mailed multiple false petitions to the United States government seeking over 71,000 foreign workers." Doc. 694-3 ¶ 28. The TCO exploited workers by demanding they pay unlawful fees, holding their identification documents, forcing them to perform demanding labor for little to no pay, forcing them "to live in crowded, unsanitary, and degrading conditions," and threatening them with violence. Id. ¶¶ 28–29. TCO members profited "over $200,000,000" from these activities. Id. ¶ 28. Agent Linemann provided details about the H-2A visa program, including the certification, authorization, and admission process using Department of Labor ("DOL") Form ETA 9142 and Department of Homeland Security ("DHS") Form I-129 Petition for Nonimmigrant Worker. Id. ¶¶ 9–23.

A federal grand jury in this District returned an indictment charging several alleged TCO members, including Bussey, with the Target Offenses.  Id. ¶ 30.  The affidavit named many of those defendants, including Bussey, as Target Subjects.  Among the identified Target Subjects, the following individuals worked with Bussey directly in their roles as part of the TCO or were defined as an "associate" of Bussey: Juana Ibarra Carrillo; Donna Michelle Rojas; Maggie Cardenas, Juan Francisco Campos; Linda Jean Facundo; Gumara Canela; Carla Yvonne Salinas; Dwayne Gillis, Inez Strickland; and Nemorio Resendiz.  Id. ¶¶ 43–47, 51–54, 57, 60, 68.  Bussey himself "file[d] fraudulent Petitions to bring foreign workers into the United States under the H-2A visa program."  Id. ¶ 50.  Bussey was "an associate of the Rojas family, Target Subject Inez Strickland, and Target Subject Dwayne Gillis."  Id.

### B.    Factual Allegations About Bussey

At the time the affidavit was executed, Bussey resided at Target Location 12 with Defendant Linda Jean Facundo.  Agents confirmed this via financial records and physical surveillance.  Id. ¶¶ 217–19.  Bussey is a former Georgia DOL housing inspector.  In that role, Bussey was responsible for H-2A approvals.  Id. ¶ 221.  Bussey filed allegedly fraudulent petitions through a business called H-2 Advisors, LLC.  H-2 Advisors, LLC was registered on March 25, 2021, to a Post Office box in Tifton, Georgia.  Id. ¶ 218.  Prior to that date, the business had been registered at 1002 Smith Avenue in Douglas, Georgia.  Id.  Bussey submitted at least eight petitions with fraudulent information, and the Department of State ("DOS") refused at least 833 visas associated with his petitions due to inaccurate or incomplete information.  Id. ¶ 222.

Agents recorded meetings between Bussey and a confidential source ("CS").  Id. ¶ 223.  The CS had the following criminal history: a 1999 sexual assault conviction in Texas; a 2006

failure to register as a sex offender/fugitive from justice conviction in Texas; a 2007 possession of a firearm by a convicted felon conviction in Georgia; and a 2013 DUI and impersonation of a public official conviction in New York. Law enforcement anticipated providing monetary compensation to the CS but would not lift an extant travel restriction. Id. ¶ 223 n.14.

The affidavit described one specific recorded meeting between Bussey and the CS. On August 20, 2019, Bussey discussed the details of the TCO with the CS. Bussey explained how he (Bussey) worked with other target subjects to recruit workers and file paperwork for more workers than farmers needed "to allow the petitioners to sell the extra workers and also let extra workers abscond under the H-2A visa program." Id. ¶ 223. The workers also paid Bussey directly for his role. Id.

On August 11, 2021, Bussey electronically submitted an ETA 9142 petition. The address listed on the form was 1002 Smith Avenue, Douglas, Georgia. Bussey filed the petition for an employer named Jennifer Rangel. The petition requested 80 workers from October 1, 2021 to December 15, 2021. The petition listed the following work locations: Jeff Davis Peanut & Grain at 42 E. Georgia Avenue, Denton, Georgia; Rogers Farm at 398 War Road, Glennville, Georgia; and Morgan Farms at 764 Lawson Road, Lyons, Georgia. Workers were to harvest peanuts, work in a peanut mill, and plant onions. They were to be housed at the Super 8 Motel at 1610 S. Peterson Avenue, Douglas, Georgia. A Form I-129 Petition IOE8317835125 was also mailed from Douglas, Georgia, requesting workers from Mexico, which was approved on September 2, 2021. Seventy-three workers entered the United States based on this petition. Id. ¶ 224.

Agents interviewed Archie Miller, the owner of Jeff Davis Peanut & Grain, on November 4, 2021. Miller explained that he had not received any workers, though he had needed them from October 1, 2021 through December 1, 2021. Miller had known Bussey for many years and

explained that Bussey had encouraged him to use the H-2A program.  Miller stated he tried many times to contact Bussey and Jennifer Rangel to determine the status of the workers.  Rangel was almost never reachable by phone, and Bussey consistently told Miller the workers would "be here tomorrow."[1]  Id. ¶ 226.  Bussey eventually stopped responding to calls.  Miller never received any H-2A workers.  Id.  On November 4, 2021, agents spoke to Pragnesh Patel, the manager of the Super 8 Motel where the workers were to stay.  Patel explained that Jennifer Rangel had reserved 27 rooms for 80 workers between October 1, 2021 and December 15, 2021, but the workers had never shown.  Rangel told Patel that the workers were still in processing.  Id. ¶ 227.

Agents obtained the IP address used to submit the ETA 9142, which they identified as being registered to Bussey at Target Location 12.  This led Agent Linemann to believe the following.  First, Bussey "prepared and electronically submitted documents connected with Petition IOE8317835125 from Target Location 12."  Id. ¶ 225.  Second, "Petition IOE8317835125 filed by Defendant Bussey is fraudulent because the workers did not stay or work at the approved locations."  Id. ¶ 228.  Third, Bussey "uses Target Location 12 to electronically prepare and file documents for the Patricio TCO, including fraudulent Petition IOE8317835125."  Id.  Finally, "evidence of the Patricio TCO's scheme to engage in mail fraud, international forced labor trafficking, and money laundering will be found at Target Location 12."  Id.

---

[1]    The affidavit is a little unclear here.  The affidavit stated that Miller "could almost never reach Rangel by phone."  Then the affidavit stated that "Rangel never returned any calls from Miller."  Doc. 694-3 ¶ 226.  It is not clear from these two statements whether Miller was ever able to contact Rangel.  The affidavit is clear, however, about Bussey's contact with Miller.

### C.    Bussey's Interactions with Other TCO Members

The affidavit described numerous interactions between members of the TCO.  Relevant to Bussey's challenge, Agent Linemann described how Defendant Juana Ibarra Carrillo worked with Bussey to further the TCO's ends.  Id. ¶ 198.  During the investigation, agents intercepted calls between Bussey and Defendant Carrillo.  In those calls, Bussey and Carrillo discussed Bussey filing fraudulent petitions on Carrillo's behalf.[2]  Id.  Agent Linemann concluded, based on "intercepted telephone calls, physical surveillance, and a review of Defendant Carrillo's financial records, that Defendant Carrillo pays Defendant Bussey for filing fraudulent petition son her behalf."  Id.

During the intercepted calls, Bussey and Defendant Carrillo repeatedly discussed filing petitions for workers for a farm in Tennessee.  The petitions requested workers to harvest tomatoes, but agents determined the workers would have actually harvested marijuana.  Bussey filed two petitions seeking workers at this Tennessee farm in 2020, both of which were denied. Id. ¶ 199.

Records produced to investigators by Square Cash App also showed that Defendant Carrillo transferred $300 to Bussey on January 28, 2021, and Defendant Carrillo's son transferred $1,000 to Defendant Bussey, "with a notation of 'mom' in the subject line." Defendant Carrillo transferred another $1,000 to Bussey on February 10, 2021.  Id. ¶ 200.  Agent Linemann explained "that these payments are consistent with payments Defendant Bussey would obtain from a farm labor contractor prior to submitting documents to request H-2A workers."  Id.

---

[2]    Agent Linemann explained that the Honorable Lisa Godbey Wood authorized a wiretap to intercept wire and electronic communications of TCO members, including Bussey.  As noted above, Bussey challenges the wiretap application in another motion.  Doc. 651.  I issued my Report and Recommendation on that motion, recommending the Court deny the motion.  Doc. 1202.

Based on a review of Defendant Carrillo's finances, Agent Linemann determined that "Defendant Carrillo receives cash from the Patricio TCO from the unlawful fees paid by workers." Id. ¶ 206.

On March 3, 2021, Bussey prepared a petition on behalf of Jennifer Rangel, Petition IOE8344252037.[3] The petition requested 68 workers at C&J Farms from April 3, 2021 to June 15, 2021. The workers would stay at Comfortel Suites in Douglas, Georgia. Sixty-seven visas were approved. Id. ¶ 201. After the workers were approved, Defendant Carrillo received checks from several local farms, which Agent Linemann concluded were in relation to Petition IOE8344252037. Id. ¶ 202. Immigration officers spoke to the owner of C&J Farms, Jody Johnson, who stated that the farm did not receive any workers related to the petition. Officers also determined that no workers stayed at the Douglas, Georgia Comfortel Suites location as the petition stated they would. Id. ¶ 203. Officers spoke with David Alberman, the manager at another location listed on the petition, J&B Packing. Alberman stated that Jody Johnson owned the facility and Alberman was unaware of any petitions that had been filed. Alberman stated he overheard a conversation between Juana Carrillo and a local farmer, where Carrillo offered the farmer $500 to "sign off on the need for farm workers." Alberman also believed the current crew leader at the facility was named Juan. Id. ¶ 204. Defendant Carrillo's husband is Target Subject Juan Carrillo. Doc. 694-3 ¶ 205. Agent Linemann concluded this was the "Juan" to whom Alberman referred. Id.

Based on these facts, Agent Linemann made the following conclusions. Defendant Carrillo paid farmers to sign petitions requesting workers when none were needed. Carrillo

---

[3]    Agent Linemann stated in the affidavit that "Jennifer Rangel" is likely a fictitious name and petitions submitted in that name were actually prepared for Defendant Carrillo. Doc. 694-3 ¶ 207.

"paid farmers to lie" so that she could request workers and move them to avoid detection by immigration officials.  Id.  The crew leader associated with the Petition was Defendant Carrillo's husband, Target Subject Juan Carrillo.  Id. ¶ 205.  Petition IOE8344252037 was likely fraudulent because Defendant Carrillo paid Bussey to file it using a "nominee name," (presumably meaning a fictitious name) and the purpose of the petition was to move workers to farms not listed on the petition for profit.  Id. ¶ 207.

The affidavit mentioned Bussey in relation to several other Target Subjects, as well.  For example, Bussey allegedly assisted with filing fraudulent petitions that would have resulted in workers being housed in substandard trailers owned by another Target Subject.  Id. ¶ 237. Additionally, Bussey submitted two other petitions on behalf of Target Subject Nemorio Resendiz that agents determined to be fraudulent.  Agent Linemann determined, through an interview with a worker who entered under one of the Resendiz petitions, that workers brought in under that petition were charged unlawful fees, workers' identification documents were unlawfully withheld, and TCO members provided unsanitary housing to the workers.  Id. ¶¶ 319–20.  Similarly, agents determined through physical surveillance that workers brought in under the second Resendiz petition were housed unlawfully, subjected to unlawful fees, subjected to unsanitary housing, and had their identification documents taken.  Id. ¶¶ 321–22.

### D.    The Warrant's Scope

Agent Linemann sought "permission to search for records that might be found" at the Target Locations, "in whatever form they are found."  Id. ¶ 325.  This is because computers can be used for a diverse range of uses and files can be stored and removed but still recovered after they are overwritten.  Id.  ¶ 326.  Determining how a computer may have been used in a criminal enterprise "often requires the seizure of the physical storage media" and often "requires

considerable time." Id. ¶ 328.  In addition, "[b]ecause several people share some of the Target

Locations as a residence, it is possible that some of the Target Locations will contains storage

media that are predominantly used, and perhaps owned, by persons who are not suspected of a

crime." Id. ¶ 330.  Agent Linemann stated that "[i]f it is nonetheless determined that it is

possible that the things described in this warrant could be found on any of those computers or

storage media, the warrant applied for would permit the seizure and review of those items as

well." Id.

## II.   Attachments to the Warrant

The warrant application referred to three relevant supporting documents: Agent

Linemann's affidavit; Attachment A-12; and Attachment B.  Doc. 694-1.  The affidavit itself

stated that it supported a warrant to search premises "further described in Attachment A-1

through A-22" and for "things described in Attachment B."  Because this particular warrant was

for Target Location 12, it referred to Attachment A-12 and the affidavit (including Attachment

B).  Doc. 694-4.

Attachment A-12 identified the premises to be searched as 410 West 6th Street, Tifton,

Georgia, with the following description: "to include all structures and vehicles, and referred to

individually as 'Target Location 12.'  Target Location 12 consisted of at least one structure, a

single-family residence with a black shingle roof, white siding[,] and a fireplace.  Tift County

property records indicated the property contained a shed."  Doc. 694-2 at 2.  Attachment A-12

also included a street view photograph of the property and an image showing the property from

above. Id. at 3.  Attachment A-12 included a rendering of the floorplan of the property. Id. at 4.

Attachment B described the items to be seized, including "evidence of violations of" the

Target Offenses.  The items to be seized included: financial records; credit card and ATM

activity; employment records; accounting records; financial statements; assets representing

proceeds of mail fraud or false statements; payroll and payroll tax records; citizenship, identity,

and nationality records; employee compensation records; calendar information; documents that

"reveal the identities and communications of co-conspirators or associates"; items showing

residency in the place to be searched; and computers (including mobile phones), their contents,

and related documentation, items, and information.  Id. at 5–11.

Bussey now moves to suppress all evidence obtained from the search of Target Location

12.  Bussey argues the warrant lacks particularity and is overbroad, in contravention of the

Fourth Amendment.  Bussey also argues Agent Linemann's affidavit contains misrepresentations

and omissions, and once these are addressed, the affidavit does not establish probable cause.

Defendant Bussey also moves for a hearing under Franks v. Delaware, 438 U.S. 154 (1978).

## LEGAL STANDARDS

### I.    Fourth Amendment Particularity Standard

The Fourth Amendment protects the "right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures."  The Amendment states

that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and

particularly describing the place to be searched, and the persons or things to be seized."

U.S. Const. amend. IV.  An individual has standing to challenge a search or seizure only if he

"can demonstrate a reasonable expectation of privacy against government intrusion."  United

States v. Cooper, 203 F.3d 1279, 1284 (11th Cir. 2000).  As to warrants themselves, "[a] warrant

which fails to sufficiently particularize the place to be searched or the things to be seized is

unconstitutionally overbroad."  United States v. Travers, 233 F.3d 1327, 1329 (11th Cir. 2000).

The warrant need not be elaborately specific, however.  "The standard is one of practical

accuracy rather than technical nicety." United States v. Rousseau, 628 F. App'x 1022, 1025 (11th Cir. 2015) (quoting United States v. Betancourt, 734 F.2d 750, 754 (11th Cir. 1984)). A search executed based on a warrant "may be as extensive as reasonably required to locate the items described in the warrant." United States v. Hunt, No. 22-12947, 2023 WL 6319363, at *2 (11th Cir. Sept. 28, 2023) (quoting United States v. Moon, 33 F.4th 1284, 1296 (11th Cir. 2022) (punctuation omitted)). Regarding the place to be searched, the warrant must "describe the place to be searched with sufficient particularity to direct the searcher, to confine his examination to the place described, and to advise those being searched of his authority." Rousseau, 628 F. App'x at 1025 (quoting United States v. Burke, 784 F.2d 1090, 1092 (11th Cir. 1986)). The particularity requirement is satisfied regarding the items to be seized when the warrant "enables the searcher reasonably to ascertain and identify the things to be seized." Id. (quoting United States v. Santarelli, 778 F.2d 609, 614 (11th Cir. 1985)).

An application for a search warrant must be supported by probable cause, and "[i]t is critical to a showing of probable cause that the affidavit state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002) (citation and punctuation omitted). Put another way, the affidavit "must contain sufficient information to conclude that a fair probability existed that seizable evidence would be found in the place to be searched." Id. (citation and punctuation omitted).

## II.    **Franks** Standard

Affidavits supporting search warrants are presumptively valid. Franks v. Delaware, 438 U.S. 154, 171 (1978). To challenge the veracity of an affidavit in support of a search warrant, a defendant must make "'a substantial preliminary showing' that (1) the affiant deliberately or

recklessly included false statements, or failed to include material information, in the affidavit; and (2) the challenged statement or omission was essential to the finding of probable cause." United States v. Arbolaez, 450 F.3d 1283, 1293 (11th Cir. 2006) (quoting Franks v. Delaware, 438 U.S. 154, 155–56 (1978)). If the defendant meets both requirements, he is entitled to an evidentiary hearing on the issue. At that hearing, the defendant must demonstrate, by a preponderance of the evidence, the existence of falsity or reckless disregard and must demonstrate that "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." Franks, 438 U.S. at 156.

The requirements for making a substantial preliminary showing are "not lightly met." Arbolaez, 450 F.3d at 1294. Negligent or insignificant false statements or omissions will not invalidate a warrant. United States v. Reid, 69 F.3d 1109, 1114 (11th Cir. 1995). Even so, intentional and reckless omissions will only invalidate a warrant "if inclusion of the omitted facts would have prevented a finding of probable cause." Madiwale v. Savaiko, 117 F.3d 1321, 1327 (11th Cir. 1997).

The defendant's burden is to show that "absent those misrepresentations or omissions, probable cause would have been lacking." United States v. Kapordelis, 569 F.3d 1291, 1309 (11th Cir. 2009) (quoting United States v. Novaton, 271 F.3d 968, 987 (11th Cir. 2001)). "[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." Franks, 428 U.S. at 172.

## DISCUSSION

Bussey contends that the warrant itself is not sufficiently particularized to pass constitutional muster and that Agent Linemann's affidavit contains material misrepresentations

and omissions.  As an initial matter, I address the Government's assertion that Bussey lacks standing to challenge the warrant.  Then, I discuss Bussey's particularity argument.  Next, I describe each misrepresentation and omission as characterized in Defendant Bussey's Motion.  I consider Agent Linemann's affidavit without the alleged misrepresentations and omissions and Bussey's request for a <u>Franks</u> hearing.  In doing so, I have considered whether Agent Linemann's affidavit would still support probable cause if it were "corrected" to address all of Defendant Bussey's allegations.  Ultimately, even considering the "corrected" affidavit, I conclude the affidavit would still support a finding of probable cause.[4]

## I.  Bussey's Standing

In its response to Bussey's Motion to Suppress, the Government argues that Bussey "fails to address his standing to suppress evidence that was seized from the residence and from electronic devices found within the residence."  Doc. 886 at 3.  In his Reply, Bussey responds, "It has long been settled that one has standing to object to a search of . . . his home."  Doc. 941 at 1 (citing <u>O'Connor v. Ortega</u>, 480 U.S. 709, 716 (1987)).

The Government and Bussey's submissions concerning standing are superficial.  The parties provide very little support for their respective positions.  Indeed, it is not clear if the Government continues to challenge Bussey's standing following the submission of Bussey's Reply.  Nonetheless, I address the Government's challenge.

The affidavit clearly establishes that Target Location 12 is Bussey's residence.  Doc. 694-3 ¶¶ 217, 219.  The ability to challenge a search of one's own home is one of the most clearly established applications of Fourth Amendment standing.  <u>See, e.g.</u> <u>O'Connor v. Ortega</u>, 480 U.S.

---

[4]    Because I conclude the affidavit would still support probable cause even if all the "corrections" were made, I do not need to determine whether the alleged misrepresentations and omissions were deliberately or recklessly made.

709, 716 (1987) (explaining that the expectation of privacy in one's home is "based on societal expectations that have deep roots in the history of the amendment") (citation and punctuation omitted); <u>Mancusi v. DeForte</u>, 392 U.S. 364, 369 (1968) ("It has long been settled that one has standing to object to a search of his office, as well as of his home."); <u>Gouled v. United States</u>, 255 U.S. 298, 305 (1921) (confirming the Fourth Amendment's prohibition against all unreasonable searches and seizures, including searches of a person's home). It is undisputed that Target Location 12 is Bussey's home. Therefore, he has standing to challenge the search of that residence.

## II.    Fourth Amendment Particularity

Bussey argues that the warrant to search 410 West 6th Street "does not meet the Fourth Amendment's particularity requirement" for two reasons. Doc. 694 at 3. First, Bussey asserts that the warrant did not sufficiently incorporate supporting documentation and so it is invalid on its face. <u>Id.</u> Second, even if Attachment A-12, Attachment B, and the affidavit were sufficiently incorporated, Bussey contends those supporting documents do not provide sufficient particularity to support issuance of a warrant. <u>Id.</u>

### A.    The Warrant Application Sufficiently Incorporated Supporting Documentation

Bussey argues that the warrant refers to Attachment A-12 and Agent Linemann's affidavit but "apparently did not expressly incorporate" the supporting documents. Doc. 941 at 4. Bussey argues further that "as provided in discovery, the warrant includes no attachments." Doc. 694 at 3. In support, Bussey cites <u>Groh v. Ramirez</u>, 540 U.S. 551 (2004). In <u>Groh</u>, the United States Supreme Court found a warrant invalid because it (1) failed to identify the items to be seized and (2) failed to incorporate supporting documentation. 540 U.S. at 557–58. Bussey argues that, because the warrant as produced in discovery was not accompanied by attachments,

the warrant "is facially invalid under Groh." Doc. 694 at 5. In response, the Government explains that the application expressly refers to Attachment A-12 for a description of the property to be seized and to Agent Linemann's affidavit for a description of the items to be seized. Doc. 886 at 9–10.

There are two ways that a warrant can incorporate supporting documents. First, the warrant may incorporate the supporting document's description by reference. Second, a warrant that does not incorporate by reference is still valid if the supporting documents accompany the warrant at the time of execution. See Battle v. Webb, 298 F. App'x 882, 884 (11th Cir. 2008) ("[A] warrant may satisfy the requirements of the Fourth Amendment through incorporation.") (citation omitted); Hawkins v. United States, Case No. CV 114-130, 2016 WL 3746202, at *9 (S.D. Ga. May 12, 2016) ("The Eleventh Circuit has long held" that a warrant may incorporate documents either by attachment or by reference.) (citing United States v. Wuagneux, 683 F.2d 1343, 1350 n.6 (11th Cir. 1982)), report and recommendation adopted, 2016 WL 3766368 (S.D. Ga. July 8, 2016).

Regarding words of incorporation, Bussey argues the warrant "apparently did not expressly incorporate" the attachments but provides no basis for why the reference words used in the warrant were insufficient. Doc. 941 at 4. The warrant clearly incorporated the supporting documents. The application and the warrant both incorporated Attachment A-12 and the affidavit by direct reference. The application and the warrant identified 410 West 6th Street, Tifton, Georgia, as the place to be searched. In the field describing the property to be searched, both the application and the warrant stated, "See Attachment A-12." In the field that described what the search will reveal, the application and the warrant stated, "See Attached Affidavit." Docs. 694-1, 694-4. The primary difference between the application and the warrant is that

16

while the application stated, "See Attachment B" for a description of items to be seized, the warrant itself stated "See Attached Affidavit." Even so, the affidavit stated that it "supports probable cause for a warrant to search the Target Locations described in Attachment A-1 through A-22 and seize the items described in Attachment B." Doc. 694-3 ¶ 339. The warrant and application, therefore, made it clear that the contents of the attachments and the affidavit were made a part of the warrant and were sufficiently incorporated by reference. See United States v. Stokes, No. 1:14-CR-290, 2017 WL 3493053, at *3 (N.D. Ga. June 23, 2017) report and recommendation adopted, 2017 WL 3481680 (N.D. Ga. Aug. 14, 2017) ("[W]hen the warrant instructs the reader to 'see' an 'exhibit' to the warrant, the warrant is making it clear that the contents of the exhibit are being made part of—or incorporated by reference into—the warrant."). Therefore, Bussey has not demonstrated the warrant is facially invalid on these grounds.

Bussey argues that the warrant "as provided in discovery" contained no attachments. Doc. 694 at 3. Bussey's argument appears to be that, because the attachments were not produced in discovery with the warrant, they were necessarily not included with the warrant at any point. Bussey's conclusion is speculative and unsupported by any authority. A search warrant must be "reviewed by a neutral and detached magistrate before it can be executed." Martin, 297 F.3d at 1316 (citation and punctuation omitted). Bussey does not allege that agents failed to provide the relevant attachments to the reviewing judge. Bussey presents no reason to believe that the supporting documents were not attached to the warrant application or the warrant itself. The clear incorporation language on the face of the application and warrant strongly supports the conclusion that the supporting documents were attached to both the application and warrant, even if the documents were not produced together in discovery.

Bussey also overstates the relevance of <u>Groh</u> to this case.  In <u>Groh</u>, the warrant at issue neither incorporated nor attached the relevant supporting documents.  <u>Groh</u>, 540 U.S. at 557.  That is not the case here.  In addition, <u>Groh</u> did not require supporting documents to be referred to *and* attached to the application and warrant.  The Supreme Court stated that "most Courts of Appeals have held that a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant."  <u>Id.</u> at 557–58.  The Eleventh Circuit Court of Appeals has recognized that either method will suffice.  Bussey has not cited any binding authority applying <u>Groh</u> in the manner he suggests.  Even if he had, the result would be the same.  Bussey has not shown a defect either in words of incorporation or attachment.  Both the application and the executed warrant incorporated the supporting documents, and Bussey makes no allegation that the attachments were not produced to the authorizing judge or that the documents were not included with the warrant at the time of execution.[5]

### B.    The Warrant Was Sufficiently Particularized

Bussey next argues that, even with supporting documentation, the warrant was insufficiently particular as to the premises to be searched and the things to be seized.  Doc. 694 at 6.  Bussey focuses on the following portions of the affidavit: (1) the request to search "data stored on a computer's hard drive or other storage media"; (2) Attachment B's expansion of that request to "electronic devices," including mobile phones; and (3) the request to search computers and storage media predominantly used or owned "by persons who are not suspected of a crime."

---

[5]    Additionally, Agent Linemann testified at the hearing that the signed warrant included the affidavit, attachment A, and Attachment B.  Doc. 1133 at 176.  When asked whether the warrant—as it was served at Bussey's residence—included a description of things to be seized, Agent Linemann responded, "That's correct, yes."  <u>Id.</u>  Bussey has not presented any evidence to indicate that the warrant as executed did not include the relevant attachments.

Doc. 694 at 6–7 (referring to ¶¶ 325–30 of Agent Linemann's affidavit and Attachment B to Agent Linemann's affidavit). Bussey argues that, read together, these paragraphs would enable agents to seize any computer or phone found at Target Location 12, "determine if it is 'possible the things described in this warrant' could be found on anything seized," and review the resulting information. Id. at 7. Bussey argues the warrant "presumes that the government can search phones unless its agents are satisfied that the phone is not linked to criminal conduct," and, Bussey argues, this broad authority is not permitted under Riley v. California, 573 U.S. 373 (2014). Doc. 694 at 8 (quoting In the Matter of the Search of: Single-Fam. Home, No. 20 M 684, 2021 WL 3204201, at *6 (N.D. Ill. June 3, 2021)).

In response, the Government states that the affidavit described Target Location 12 by its address and incorporated Attachment B, which listed the property to be seized. Doc. 886 at 9. Attachment B provided a seven-page description of items to be seized as evidence of the Target Offenses. Id. at 11. In addition, Attachment A-12 described the residence in detail and included a street view photograph, an overhead image, and a rendering of the floorplan of the structure. Id. at 10–11. The Government argues that the warrant was sufficiently particularized because it expressly limited the search to items used in violation of specific criminal statutes. Id. at 12–13.

### 1.    *The premises to be searched.*

As an initial matter, there does not appear to be a genuine dispute regarding the premises to be searched. Bussey claims that the warrant "does not describe the premises to be searched." Doc. 694 at 4. However, Bussey does not argue that the address on the warrant or the description in Attachment A-12 was deficient in any way. In addition, a warrant "need only describe the place to be searched with sufficient particularity to direct the searcher, to confine his examination to the place described, and to advise those being searched of his authority." United

States v. Goodlow, 389 F. App'x 961, 971 (11th Cir. 2010) (quoting United States v. Ellis, 971 F.2d 701, 703 (11th Cir. 1992)).  The warrant gave Target Location 12's street address. Attachment A-12 included "all structures and vehicles" on the property.  The warrant described Target Location 12 as "at least one structure, a single-family residence with a black shingle roof, white siding, and a fireplace," with a shed.  As discussed above, Attachment A-12 also included a street-view photograph of the residence, an overhead image, and a rendering of the floorplan. Doc. 694-2 at 2–4.  This description is specific and detailed.  Thus, it adequately directs the searcher, confines the examination, and advises those being searched of the searcher's authority.

### 2.    *The items to be seized.*

The parties' dispute focuses on the scope of the terms of items to be seized under the warrant.  The warrant itself referred to the affidavit for a description of the items to be seized. Doc. 694-1.  The affidavit, in turn, relied on Attachment B, which was a detailed list of "items to be seized."  Attachment B stated that the items to be seized are evidence of violations of the Target Offenses.  Doc. 694-2 at 5–11.  The affidavit expanded on Attachment B's description, stating that the warrant application sought "permission to search for records . . . in whatever form they are found."  Doc. 694-3 ¶ 325.  This included "storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime" if agents determine that "it is possible that the things described in this warrant could be found on any of those computers or storage media . . . ."  Id. ¶ 330.

Bussey argues that this authorization is overly broad.  In support, he cites In the Matter of the Search of: Single-Fam. Home, No. 20 M 684, 2021 WL 3204201, at *6 (N.D. Ill. June 3, 2021).  In that case, an Illinois district court found a residential search warrant application to be deficient.  The warrant application sought authorization to search telephones belonging to

individuals other than the primary suspect.  The court found that there were "no facts or circumstances that would support a probable cause showing as to third-parties' cellular telephones found at" the residence.  Id. at *5.  Bussey argues that the search warrant in this case similarly authorized the search and seizure of third-party devices, with no evidence that those devices contained evidence of criminal conduct.  Doc. 694 at 8.

Both Bussey and the court in Single-Family Home rely on Riley v. California, 573 U.S. 373 (2014).  In Riley, the Supreme Court held that "officers must generally secure a warrant before conducting" a cell phone search.  That case addressed whether an officer could search a cell phone obtained during a search conducted incident to arrest.  The Court discussed the unique nature of cell phones in modern society and concluded that cell phones merit a substantial level of protection under the Fourth Amendment.  Riley, 573 U.S. at 393 ("Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse.").  Bussey argues that the warrant in this case, in seeking seizure of all computers, including cell phones, contravenes Riley and the Fourth Amendment protections it affords to modern phones.  Doc. 694 at 8.

The Government does not dispute Bussey's factual characterization of the warrant and supporting documents.  Instead, the Government argues that the seizure was limited to evidence of violations of specific criminal statutes.  Doc. 886 at 11–12.  The Government cites Signature Pharmacy, Inc. v. Wright, 438 F. App'x 741 (11th Cir. 2011), in support.  In Signature Pharmacy, the Eleventh Circuit held that a warrant authorizing seizure of several categories of items was not overly broad because it referred "to items that are evidence of a violation of certain statutes relating to the sale of controlled substances."  Id. at 745–46.  The Government

21

argues that, because the affidavit limited seizure to evidence of the Target Offenses, the warrant is sufficiently particular under Signature Pharmacy.

The particularity requirement's purpose is to prevent general searches.  See United States v. Travers, 233 F.3d 1327, 1329 (11th Cir. 2000) (explaining that the particularity requirement "makes general searches . . . impossible" and to deter such searches, evidence resulting from them is excluded from trial).  But it is also "universally recognized that the particularity requirement must be applied with a practical margin of flexibility, depending on the type of property to be seized, and that a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit." United States v. Wuagneux, 683 F.2d 1343, 1349 (11th Cir. 1982) (citation omitted)).  The Eleventh Circuit has recognized that a warrant that refers "to items that are evidence of a violation of certain statutes" is sufficiently particularized.  Signature Pharm., 438 F. App'x at 746.  This is because a warrant must only be particular enough to enable the searcher "reasonably to ascertain and identify the things to be seized."  Id. (citing United States v. Betancourt, 734 F.2d 750, 754–55 (11th Cir. 1984)).

Riley, however, recognized that cell phones require special consideration.  The Supreme Court explained that cell phones have "immense storage capacity" which, among other things, allows for "the sum of an individual's private life" to be held on a single device.  Riley, 573 U.S. at 394.  Phone data can reveal a person's private interests and concerns, their location history, and more in a comprehensive and discrete package.  In addition, a cell phone search can often reveal more information than even a comprehensive search of a house: "A phone not only contains in digital form many sensitive records previously found in the home; it also contains a

broad array of private information never found in a home in any form—unless the phone is." Id. at 396–97.

Thus, while Riley's holding is limited to warrantless searches incident to arrest, the Supreme Court's analysis in that case demonstrates a distinct, substantial Fourth Amendment concern regarding modern cell phones. Courts, therefore, consider the significant privacy intrusion inherent in a cell phone search. See Matter of Search Warrant Application for the Search of a Townhome Unit, No. 20 MC 106, 2020 WL 1914769, at *3 (N.D. Ill. Apr. 20, 2020) (suggesting, in view of Riley, "caution before a court authorizes seizure of all electronic devices from a premises").

The warrant here was not overly broad, for several reasons. First, the warrant and supporting documentation established probable cause to seize electronic storage media located at the residence. The affidavit provided good reasons for seizing records "in whatever form they are found." For example, Agent Linemann concluded, "[b]ased on actual inspection of other evidence related to this investigation . . . I am aware that computer equipment was used to generate, store, and print documents used in the mail fraud, international forced labor, and money laundering scheme." Doc. 694-3 ¶ 326(e). Data stored on that equipment "may provide crucial evidence of the 'who, what, why, when, where, and how' of the criminal conduct under investigation." Id. ¶ 327(b). Further, Agent Linemann stated, "I know when an individual uses a computer to email and submit documents electronically to the United States government for the H-2A visa process, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime." Id. ¶ 327(f). Agent Linemann also noted the possibility that "the things described in this warrant could be found on any" computer found at the Target Location, including those that belong to people not

accused of a crime, because "several people share some of the Target Locations as a residence." Id. ¶ 330. It is undisputed that Target Location 12 was not only Bussey's residence but also the residence of Defendant Facundo, increasing the likelihood that relevant evidence would be found on devices not belonging to Bussey. Doc. 694-3 at ¶ 217. The affidavit also alleges that Bussey worked with multiple other defendants and Target Subjects. In sum, the issuing Magistrate Judge did not merely authorize a general search of all electronic devices with no rationale. Law enforcement agents executing the warrant had no way to know which computers held evidence of the Target Offenses and which did not. The affidavit explained in detail why any the seizure needed to be as broad as it was, and Attachment B explained that any seizure should be limited to evidence of the Target Offenses.

Second, the nature of the crimes under investigation supports the validity of a warrant for all electronic devices in the residence. Particularity is subject to greater flexibility when the crimes being investigated involve complex financial fraud. See Wuagneux, 683 F.2d at 1349 (finding, in investigations "involving complex financial transactions and widespread allegations of various types of fraud, reading the warrant with practical flexibility entails an awareness of the difficulty of piecing together the 'paper puzzle'"); United States v. Martinelli, 454 F.3d 1300, 1308 (11th Cir. 2006) (applying a "more flexible reading" of the particularity requirement in a mail fraud case) (citation omitted). The warrant application involved 22 Target Locations and 39 Target Subjects, many of whom were accused of working together and not all of whom were indicted in this case. The affidavit explained that law enforcement agents were investigating an international fraud and forced labor conspiracy. The affidavit alleged that, in total, the TCO made over $200,000,000 in illegal profits. Doc. 694-3 ¶ 28. The suspected criminal enterprise

was both extensive and complex, which makes it difficult for the warrant to be any more particular than it was.

Third, Attachment B also limited the seizure to discrete categories of data on items which were "evidence of violations of" the Target Offenses. Doc. 694-2 at 5. The Eleventh Circuit has held that a warrant authorizing seizure of several categories of items was not overly broad because it referred "to items that are evidence of a violation of certain statutes relating to the sale of controlled substances." Signature Pharm., 548 F. App'x at 745–46; see also Rousseau, 628 F. App'x at 1025–26 ("[W]here it is not feasible at the time the warrant is issued to give an exact description of the materials to be seized, the warrant satisfies the Fourth Amendment's particularity requirement if it limits the seizure of items to only those items that constitute evidence of criminal activity.") (citing Santarelli, 778 F.2d at 614 (11th Cir. 2015).

Warrants that are limited to seizure of evidence of specific, enumerated statutory offenses are routinely found to be sufficiently particularized. See United States v. Archie, Crim. Action No. 1:15-CR-00338-1, 2016 WL 11650551, at *3 (N.D. Ga. Apr. 18, 2016) ("By explicitly limiting the scope of what may be searched and seized to evidence of the crimes under investigation, the warrant was sufficiently particular to enable the searcher to reasonably ascertain and identify the property authorized to be seized."); United States v. Hill, Case No. 6:19-cr-1, 2019 WL 2904731, at *6 (M.D. Fla. July 6, 2019) (upholding a warrant that "authorized the seizure of computers containing evidence of violations of the enumerated statutes"); United States v. Rhame, Crim. Action No. 1:16-CR-67, 2018 WL 1082327, at *18 (N.D. Ga. Feb. 28, 2018) ("[E]ven when a warrant authorizes the seizure of 'all property' at a particular residence, the Eleventh Circuit has held the warrant is not overly broad if 'it limited

the seizure to items that constituted evidence of" the crimes at issue.") (citing <u>Santarelli</u>, 778 F.2d at 615).  Attachment B expressly limits its scope to violations of specific criminal statutes.

The seizure is further limited to discrete categories of information.  Attachment B states: "For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored, records or information that is otherwise called for by this warrant . . . ."  Doc. 694-2 at 3.  Attachment B then lists 15 discrete categories of data, including, for example, evidence of who used, owned, or controlled the computer, evidence of malicious software, and evidence indicating the user's state of mind "as it relates to the crimes under investigation."  <u>Id.</u> at 3–5.  To be sure, these categories permit the searcher to access large amounts of information on a device.  But the warrant does not simply cite criminal violations and then seek an unlimited search of every device on the premises. Rather, it seeks specific categories of data that are evidence of the violations.  That cuts in favor of the warrant being sufficiently particularized.  <u>See</u> <u>United States v. McCall</u>, 84 F.4th 1317, 1328 (11th Cir. 2023) ("Of course, those categories encompassed most of the account's conceivable data.  But we do not suppress evidence on overbreadth grounds if the warrant 'adequately conveys its parameters.'" (quoting <u>United States v. Delgado</u>, 981 F.3d 889, 899 (11th Cir. 2020)); <u>see, e.g.</u>, <u>United States v. Addaquay</u>, Crim. Action No. 1:20-cr-00126, 2021 WL 1541051, at *5 (N.D. Ga. Apr. 20, 2021) ("Here, the categories of information the warrant authorizes the Government to search are numerous but specifically connect the items to be searched for and seized to the specific criminal conduct suspected.") (quoting <u>United States v. Zhu</u>, 555 F. Supp. 2d 1375, 1381 (S.D. Ga. 2008)).

Bussey relies on <u>Single-Family Home</u> to support the proposition that any warrant allowing the search of third-party cellular phones on a premises is insufficiently particularized.

Single-Fam. Home, 2021 WL 3204201, at *6–7.  As noted, Single-Family Home relied heavily on the Supreme Court's decision in Riley.  Bussey also relies on Riley.  Doc. 694 at 8 ("For the same reasons as in Single-Family Home, this warrant lacks particularity, is overly broad, and contravenes Riley.").

As explained above, Eleventh Circuit caselaw post-Riley supports a finding that the warrant was sufficiently particular.  Bussey has made not presented an argument to depart from that caselaw, and Riley itself does not require a different result.  Riley's holding concerned a warrantless search of a cell phone incident to arrest.  The vast majority of Eleventh Circuit courts interpreting Riley confine themselves to that issue.  In fact, Bussey has identified no court in this Circuit applying Riley in the manner he proposes.  The officers in this case did obtain a warrant, as the Supreme Court in Riley required.  Moreover, the warrant established probable cause to seize all phones on the property, the crimes under investigation were complex, transnational crimes with a complex paper trail, and the warrant limited the seizure to discrete categories of data related to specific criminal offenses.

Additionally, Single-Family Home itself does not require a different result.  First, Single-Family Home is not controlling authority.  The Eleventh Circuit has not embraced the application of Riley that the court in Single-Family Home articulated, nor has any district court in this circuit.  Second, even if Single-Family Home was controlling authority, it is factually distinguishable from the instant case.  Single-Family Home involved the seizure of all cell phones in a residence where there was no reason whatsoever to believe evidence of a crime would be found on phones owned by third parties.  Single-Fam. Home, 2021 WL 3204201, at *1–4.  The warrant application explained that "Subject One" had committed criminal offenses involving child pornography and sought evidence "related to the possession and distribution of

child pornography." Id.  The application requested permission to seize all cell phones found at the residence, even those not belonging to Subject One.  The warrant application contained no information concerning any other offenses, premises, or target individuals.  The court concluded that the application did "not describe with particularity those cellular telephones that agents could seize." Id. at *1.  The court further concluded that there was "no showing of probable cause" to search cell phones not belonging to or primarily used by Subject One.  Id. at *5.

In contrast, the warrant application at issue in this case provided additional provided additional details supporting seizure of devices belonging to third parties.  The application explained that at least one individual other than Bussey, who was also suspected of participating in the criminal enterprise, resided at Target Location 12.  Additionally, the warrant described specific instances of Bussey using electronic devices to engage in conduct related to the alleged criminal conspiracy.  And the warrant limited its scope to discrete categories of data that constituted evidence of specific criminal violations.  In the Eleventh Circuit, each of these factors favor upholding a warrant.  Even considering Riley and Single-Family Home, Bussey has failed to satisfy his burden to show the warrant for Target Location 12 is invalid.  See United States v. Lockett, 533 F. App'x 957, 965 (11th Cir. 2013) ("When a search is conducted pursuant to a warrant, the burden is on the defendant to show that the warrant is invalid.") (citing United States v. Osborne, 630 F.2d 374, 377 (5th Cir. 1980)).  For all these reasons, I conclude that Bussey has not demonstrated the warrant is overly broad.

C.    **Blanket Suppression Is Inappropriate**

Bussey has not shown that the warrant is constitutionally deficient, but even if he had, it is unclear what his desired remedy would be.  Bussey appears to seek blanket suppression of all evidence resulting from the search of his home.  But the appropriate remedy in a particularity

challenge is to "sever the infirm portion of the warrant from so much of the warrant as passes constitutional muster."  United States v. Cook, 657 F.2d 730, 735 (5th Cir. 1981); see also United States v. Yusuf, 461 F.3d 374, 393 n.19 (3d Cir. 2006) ("[A]n overly broad warrant can be redacted to strikeout those portions of the warrant that are invalid for lack of probable cause, maintaining the remainder of the warrant that satisfies the Fourth Amendment."); United States v. Castro, 881 F.3d 961, 965 (6th Cir. 2018) ("The remedy [for overbreadth] is to sever the offending phrase from the warrant, suppress any evidence collected under it, and admit the evidence collected under the valid portions that remain.") (citation omitted).  The point is to suppress only evidence "improperly taken," not every single piece of evidence seized.  Cook, 657 F.2d at 734.

Bussey challenges the affidavit's reference to "data stored on a computer's hard drive or other storage media" and Attachment B's reference to "electronic devices," including computers and smartphones.  Bussey challenges seizure of these items in conjunction with the affidavit's extension of the search to computers "predominantly used, and perhaps owned, by persons who are not suspected of a crime."  Thus, even if the Court accepted Bussey's particularity argument, it would only impact information contained on some computers and cell phones not owned by Bussey.  But it is not clear if any cell phones were even seized and Bussey has not identified any.  Some courts in this Circuit have denied motions to suppress at the movant's failure to identify specific items seized that were beyond the appropriate scope of the warrant.  See United States v. Phothisat, Crim. No. 14-00213, 2015 WL 4979196 (S.D. Ala. Oct. 6, 2014) (denying a motion that failed to identify specific items seized beyond the scope of the warrant); United States v. Lisbon, 835 F. Supp. 2d 1329 (N.D. Ga. 2011) (denying a motion to suppress partially because the defendant did not specify which items were seized in violation of the warrant), report and

recommendation adopted, 835 F. Supp. 2d 1329 (N.D. Ga. 2011).  Here, Bussey has failed to identify any evidence that he claims was improperly seized, and that alone would be a reason to deny the Motion.  Regardless, even if the Court agreed with Bussey that the warrant was insufficiently particular, the relief requested—suppression of all fruits of the search—is improper.

## III.    Alleged Misrepresentations and Omissions

Bussey contends that Agent Linemann's affidavit contained several misrepresentations and omissions.  First, Bussey contends that the affidavit misrepresented facts about Bussey's business relationship with Defendant Juana Carrillo, including details about a March 3, 2021 petition that Bussey filed.  Id. at 10–13 (referring to ¶¶ 9–23, 197–207 of Agent Linemann's affidavit).  Second, Bussey contends the affidavit misrepresented the importance of DOS's prior refusals of visa requests associated with Bussey.  Id. at 13 (referring to ¶ 222 of Agent Linemann's affidavit).  Third, Bussey argues that Agent Linemann omitted details about the CS's criminal history.  Id. at 14 (referring to ¶ 223 n.14 of Agent Linemann's affidavit).  Fourth, Bussey argues that Agent Linemann omitted and misrepresented details about meetings between Bussey and the CS.  Id. (referring to ¶ 223 of Agent Linemann's affidavit).  Finally, Bussey argues that Agent Linemann misrepresented facts about documents that Bussey submitted in relation to Petition IOE8317835125.  Id. at 14–18 (referring to ¶¶ 224–28 of Agent Linemann's affidavit).

### A.    The H-2A Visa Process

Many of Bussey's arguments center on petitions that Bussey filed in furtherance of H-2A visa applications.  A discussion of the H-2A visa application and admission process is helpful to

understand Bussey's arguments.  The following summary of the process comes from Agent

Linemann's affidavit.  Doc. 694-3 ¶¶ 9–23.  This portion of the affidavit is largely undisputed.

Foreign nationals may obtain authorization to work for pay in the United States by

obtaining an H-2A non-immigrant visa.  The visa must be sponsored by a qualifying employer in

the United States.  The prospective employer must submit documentation to DOL, USCIS

(United States Citizenship and Immigration Services), and sometimes DOS.  Id. ¶¶ 9–12.

A farm labor contractor or its agent may complete the labor certification application with

the DOL.  First, the contractor must file a DOL Form 970 Job Order with the State Workforce

Agency in the area of intended employment.  The Form 970 lists the hours and location where

the workers will be employed.  This allows the State Workforce Agency to recruit domestically

and "test the local jobs market" for the requested labor.  Id. ¶¶ 13–16.

Next, the contractor may apply as an employer using an ETA 9142 Application for

Temporary Employment Certification.  The contractor must submit the name and location of

each fixed-site agricultural business to which the contractor expects to provide workers, along

with other information.  An employer or the employer's agent can submit the ETA 9142

electronically.  An electronically submitted ETA 9142 does not require an original signature at

the time of submission.  However, it must be signed by both the employer and the employer's

agent before final approval.  Id. ¶ 17.

Once the ETA 9142 is certified, the employer submits a Form I-129 Petition for Non-

Immigrant Worker to USCIS.  An agent may file the petition.  The petition is signed by the agent

and signed by the employer under penalty of perjury.  The petition must be mailed to a USCIS

service center.  Upon USCIS approval, an embassy or consulate abroad may interview foreign

nationals and process their H-2A visa applications.  Id. ¶¶ 18–23.

### B.    Bussey's Business Relationship with Defendant Carrillo

Bussey claims Agent Linemann's description of Bussey's involvement with Defendant Carrillo omitted and misrepresented important details.[6]  Bussey claims the affidavit failed to describe petitions that Bussey filed in 2020 for a Tennessee farmer to harvest tomatoes.  The affidavit stated that Bussey worked with Carrillo to have workers harvest marijuana in Tennessee under the pretense of harvesting tomatoes but did not identify the petitions Bussey filed to that end.  Doc. 694 at 9–10 (referring to ¶¶ 198–99 of Agent Linemann's affidavit).  Agent Linemann also discussed an I-129 that Bussey filed on March 3, 2021, for which he was paid by Defendant Carrillo.  Id. at 10–13 (referring to ¶ 9–23, 197–207 of Agent Linemann's affidavit).

Bussey argues that, as an agent, he was not responsible for these petitions.  Id. at 13.  Bussey claims this portion of the affidavit characterized him as an agent without properly explaining the respective roles of an agent and employer.  Bussey specifically claims the affidavit failed to describe "the regulatory scheme that treats agents differently from employers and labor contractors."  Id. at 11.  Bussey states an agent is "authorized to act on behalf of an employer" but the employer has the employment relationship with the worker and is the individual "on whose behalf an Application for Temporary Employment Certification is filed."  Id. at 11–12 (citing 20 C.F.R. § 655.103(b)).  And, unlike an agent, an employer must "comply with all the assurances, guarantees, and other requirements contained" in the Regulations.  Id. at 12 (citing 20 C.F.R. § 655.132).

---

[6]    Agent Linemann's discussion of Bussey's involvement with Defendant Carrillo is organized under Target Locations 9 and 10.  This Motion concerns Target Location 12.  Even so, "[w]hen reviewing an affidavit to see if it contains probable cause, the entire affidavit must be read together as a whole."  United States v. Gil, Case No. 10-20766-CIV, 2011 WL 817932, at *3 (S.D. Fla. Jan. 13, 2011) (citing United States v. Reed, 700 F.2d 638, 641 (11th Cir. 1983)).

Bussey also explains that the certifications made by agents and employers differ.  The employer "certifies under penalty of perjury that the substance of the petition is correct."  Id. at 12.  The agent, on the other hand, certifies he prepared the petition on behalf of the labor contractor, "who reviewed the petition and informed him that it was correct."  Id. at 12–13.  Bussey claims the affidavit omitted these facts.

### C.    Prior Refused Visas

Agent Linemann's stated that Bussey has had at least eight fraudulent petitions and 833 refused visas, but Bussey argues the affidavit omitted important information about those petitions and requests.  Doc. 694 at 13 (referring to ¶ 222 of Agent Linemann's affidavit).  Bussey makes the same argument in another motion to suppress.  Doc. 637 at 10–11, 13.  Bussey "relies on the argument in that motion and incorporates it here by reference."  Doc. 694 at 13.

### D.    The CS's Criminal History

Bussey acknowledges the affidavit provided some information about the CS's criminal history, but Bussey argues the affidavit should have included more detail.  Bussey makes this argument in another motion to suppress. Doc. 651 at 11–12.  Bussey "relies on the argument in that motion and incorporates it here by reference."  Doc. 694 at 14.

### E.    Meetings Between Bussey and the CS

Bussey argues that the affidavit failed to include important information about his contacts and communications with the CS.  Bussey makes this argument in another motion to suppress.  Doc. 651 at 11–19.  Bussey "relies on the argument in that motion and incorporates it here by reference."  Doc. 694 at 14.

### F.    Petition IOE8317835125

Bussey argues that the affidavit omitted important information about an August 11, 2021 ETA 9142 application requesting 80 workers for a peanut mill and two onion farms. Specifically, the affidavit stated that workers never showed up at the approved worksites and never stayed at the approved accommodations specified in the paperwork. Bussey argues this is because Jennifer Rangel, the employer listed on the application, responded to a Notice of Deficiency ("NOD") letter on August 23, 2021, granting permission for the peanut farm to be removed from the application. Bussey argues this fact was omitted from the affidavit. Doc. 694 at 14–18. Bussey also states that, as an agent, he only certified under penalty of perjury that he prepared the petition, and the petitioner reviewed it and informed him "that all of the information in the form and in the supporting documents is complete, true, and correct." Id. at 15.

In addition, Bussey argues the affidavit omitted information about the workers' accommodations. The affidavit stated investigators spoke to the manager of the hotel where workers were meant to stay, and he told investigators the workers never arrived. Bussey argues the manager only ever spoke to and about Jennifer Rangel, not Bussey. Id.

## IV.    <u>Franks</u> Analysis

I consider the second <u>Franks</u> element first, namely, whether the affidavit would still support probable cause when corrected to address the alleged misrepresentations and omissions. Affidavits in support of search warrants must "state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." <u>Martin</u>, 297 F.3d at 1314. The Court must, therefore, determine if the affidavit establishes probable cause that evidence of a crime would be found at Target Location 12.

### A.    The Affidavit's Unchallenged Portions Establish Probable Cause

I begin with a summary of the unchallenged portions of the affidavit.  In the affidavit, Agent Linemann stated there was probable cause to believe Bussey committed several Target Offenses, including conspiracy to commit mail fraud, forced labor, and money laundering.  The affidavit extensively described Bussey's detailed knowledge of the Target Offenses and his own demonstrated involvement in the H-2A visa application process.  The affidavit also explained how Bussey filed potentially fraudulent applications from his own home.

Examining the affidavit as a whole—and based solely on the aspects that Bussey does not challenge as misrepresentations or omissions—the affidavit demonstrates sufficient probable cause for the issuance of a search warrant.  It is undisputed that a federal grand jury returned an indictment charging Bussey for his involvement with conspiracy to engage in mail fraud, forced labor, and money laundering.  Doc. 694-3 ¶ 30.  It is also undisputed that co-Defendant Linda Jean Facundo resided at with Bussey at Target Location 12.  Id. ¶¶ 30, 219.  It is undisputed that the following Defendants and Target Subjects worked with Bussey in the H-2A process or were associated with Bussey in some way: Defendants Juana Ibarra Carrillo, Donna Michelle Rojas, Margarita Rojas Cardenas, Juan Francisco Campos, Rosalva Garcia Martinez, Linda Jean Facundo, Gumara Canela, and Carla Yvonne Salinas; and Target Subjects Dwayne Gillis, Inez Strickland, and Nemorio Resendiz.  Id. ¶¶ 43, 44, 45, 46, 47, 51, 52, 54, 57, 60, and 68.

Regarding Bussey's relationship with Defendant Juana Carrillo, it is undisputed that Bussey exchanged several phone calls with Carrillo discussing filing H-2A petitions for a Tennessee farmer to harvest marijuana, under the pretense of operating a tomato farm.  Bussey filed two petitions for that farm, and the United States issued no visas based on those petitions. Id. ¶ 199.  Carrillo paid Bussey multiple times in amounts "consistent with payments Defendant

Bussey would obtain from a farm labor contractor prior to submitting documents to request H-2A workers." <u>Id.</u> ¶ 200.  Bussey also does not contest the affidavit's conclusions about Carrillo, specifically that she was responsible for multiple fraudulent petitions and moved workers illegally.  <u>Id.</u> ¶ 207.

Regarding Bussey's involvement in fraudulent petitions, it is undisputed that he submitted eight petitions that investigators flagged as potentially containing fraudulent information and DOS refused 833 visas associated with his petitions because of inaccurate or incomplete information.  <u>Id.</u> ¶ 222.  Bussey also does not dispute Agent Linemann's conclusion that he prepared and submitted documentation relating to H-2A petitions from Target Location 12.  <u>Id.</u> ¶ 228.  Bussey does not dispute that Target Subject Inez Strickland registered H-2A Advisors, LLC, a company for which Bussey is listed as the manager and through which he filed H-2A petitions.  <u>Id.</u> ¶ 218.  It is further undisputed that Bussey discussed with Defendant Canela the possibility of housing workers illegally and that he filed petitions to that end.  <u>Id.</u> ¶¶ 236–40. Finally, Bussey does not dispute Agent Linemann's conclusion that he (Bussey) filed an ETA 9142 on January 8, 2021, an I-129 on January 21, 2023, an ETA 9142 on June 14, 2021, and another I-129 on July 28, 2021, which agents later determined to be fraudulent.  <u>Id.</u>  ¶¶ 317–18, 320–22.

Bearing in mind that "probable cause does not require overwhelmingly convincing evidence but only reasonably trustworthy information," <u>Ortega</u>, 85 F.3d at 1525, the affidavit supports probable cause to believe evidence of illegal activity would be found at Target Location 12.  Bussey resided at Target Location 12 with Defendant Facundo.  Target Location 12 was registered as Bussey's business address.  Bussey had filed H-2A documentation on behalf of or in association with multiple co-Defendants and Target Subjects.  Bussey filed several petitions

that agents determined to be fraudulent. These undisputed facts "establish a connection between [Bussey] and the residence to be searched" and "a link between the residence and any criminal activity." Kapordelis, 569 F.3d at 1310. Because Bussey resided at Target Location 12 and used it to file H-2A petitions and Bussey's petitions undisputedly demonstrated criminal activity, the affidavit's unchallenged conclusions sufficiently establish probable cause to search Target Location 12.

**B.      The Affidavit's Alleged Misrepresentations or Omissions Do Not Undermine Probable Cause**

Even if the Court accepted all of Bussey's challenges—correcting the alleged misrepresentations and including the omitted facts—the affidavit would still support probable cause. In other words, even when considering Bussey's challenges, the challenges would not prevent a finding of probable cause. Bussey makes several challenges to the affidavit. To summarize, Bussey argues for the following corrections:

1.      Concerning petitions filed on behalf of Defendant Carrillo, the affidavit should have described the different Form I-129 certification standards for a signing employer and a signing agent. While both agents and employers sign under penalties of perjury, the agent merely certifies that the employer informed him that the information in the petition was correct. Thus, the employer is responsible for the substance of the petition.

2.      The affidavit should have explained that refusal of visas is standard practice under federal Regulations.

3.      The affidavit should have included a detailed, accurate criminal history for the CS, including his 2000 nolo contendere plea for sexual assault.

4.      The affidavit should have included details about the April 30, 2019 and August 20, 2019 meetings with the CS, and a September 30, 2019 call with the CS.

5.      The affidavit should have included more details about Bussey's August 11, 2021 petition requesting workers for several locations, including Jeff Davis Peanut & Grain. Specifically, employer Jennifer Rangel wrote a response to a Notice of Deficiency Letter. In that response, Rangel allowed for removal of Jeff Davis Peanut & Grain from Petition

> IOE8317835125. This would have explained why no H-2A workers ever reported to that location. The affidavit also should have disclosed that the manager of the hotel where the workers were to have stayed only ever spoke to and about Rangel, not Bussey.

As explained below, the affidavit would still support probable cause even if these changes were made. I address each challenge in turn.

### 1. Bussey's business relationship with Defendant Carrillo.

Bussey's arguments concerning the applications he filed with Defendant Carrillo do not materially impact probable cause. Bussey states the affidavit omits information about the different roles of employers and agents, as set forth in applicable Regulations. Bussey does not, however, explain how including information about the Regulations would impact probable cause. Applying Bussey's argument, the affidavit should have stated something like: "The Regulations provide that the agent is authorized to act on behalf of an employer, but the employer is the individual who must comply with assurances, guarantees, and other requirements contained in the Regulations." Even considering that addition, the agent still certifies the application and accepts potential criminal liability by doing so. Adding the information Bussey advocates for would not suggest that Bussey, as an agent, bore no responsibility for submitting a fraudulent application. Bussey has not shown how inclusion of this additional information would have materially impacted probable cause.

Regarding the substance of the certification, Bussey's arguments are unavailing.[7] On a Form I-129, the employer certifies the following:

---

[7]     As an initial matter, it appears Bussey's argument conflates the standards for an ETA 9142 and a Form I-129. The relevant portions of the affidavit identify a Form I-129 Bussey filed on March 3, 2021. Bussey accurately describes the different certifications made by agents and employers but discusses them in the context of an ETA 9142. Doc. 694 at 12–13. I will analyze Bussey's argument with the understanding the relevant certifications are for a Form I-129.

> I certify, under penalty of perjury, that I have reviewed this petition and that all of the information contained in the petition, including all responses to specific questions, and in the supporting documents, is complete, true, and correct.

The agent, on the other hand, certifies:

> By my signature, I certify, swear, or affirm, under penalty of perjury, that I prepared this petition on behalf of, at the request of, and with the express consent of the petitioner or authorized signatory. The petitioner has reviewed this completed petition as prepared by me and informed me that all of the information in the form and in the supporting documents, is complete, true, and correct.

Doc. 694-5 at 9. Bussey contends that the affidavit should have explained the distinction in the certification language in more detail. But Bussey has not shown that this additional information would have impacted probable cause. As noted above, probable cause to search a residence requires demonstration of a sufficient a connection between the defendant and the residence, as well as a connection between the residence and any crime. Kapordelis, 569 F.3d at 1310. The precise details of Bussey's certification of a particular I-129 matters little to the determination of probable cause. Bussey does not dispute that Target Location 12 was his residence, that he prepared H-2A documentation from Target Location 12, or that he kept business records at Target Location 12. The affidavit stated that Bussey prepared I-129 Petition IOE8344252037 on March 3, 2021. Agents later determined that petition to be fraudulent. These facts, taken together, support probable cause even with Bussey's proposed additional information because the facts connect Bussey to the Target Location 12 and connect Target Location 12 to criminal conduct.

In addition, Bussey does not dispute the affidavit's conclusion that "Jennifer Rangel" is a "nominee" or fictitious name. Therefore, the affidavit suggests Bussey's certification of the affidavit may indeed be fraudulent, even based on the more limited agent certification Bussey points to. If an agent certifies that he prepared a petition on behalf of an employer who does not

exist, he would potentially be subject to criminal penalties. Thus, even if the affidavit were corrected in the manner Bussey suggests, Petition IOE8344252037 would still be relevant to a finding of probable cause.

Bussey makes one additional argument regarding this portion of the affidavit. The affidavit stated that Bussey prepared two petitions on behalf of Defendant Carrillo for workers to harvest marijuana under a pretense of farming tomatoes. Bussey argues it was an omission for the affidavit not to provide more detail about those petitions. Bussey provides no reason why this omission is material. Bussey does not, for example, argue those petitions were never filed. Therefore, this argument fails.

### 2.    *Prior refused visas.*

Bussey argues the affidavit should have explained that refusal of visas "is what happens if one submits inaccurate or incomplete petitions." Doc. 694 at 13. Bussey incorporates his argument from another motion to dismiss. Doc. 637 at 10–11, 13. His argument is unconvincing for the same reasons I gave in my previous Report and Recommendation, doc. 1218 at 27–28. As such, I incorporate by reference my prior analysis as if fully set forth here.

### 3.    *The CS's criminal history.*

Bussey argues the affidavit should have explained that the CS entered a nolo contendere plea for sexual assault in 2000 and should have provided details about that conviction. Doc. 651 at 12. Bussey also asserts the affidavit should have provided more information about the CS's prior gun conviction. Id. Bussey incorporates his argument from another motion to dismiss. Doc. 651 at 12. His argument is unconvincing for the same reasons I gave in my previous Report and Recommendation, doc. 1202 at 31–32. As such, I incorporate by reference my prior analysis as if fully set forth here.

### 4.    *Bussey's meetings with the CS.*

Bussey argues the affidavit should have described his meetings with the CS on April 30, 2019 and August 20, 2019, and a call with the CS on September 30, 3019.  Doc. 651 at 12–19. Bussey incorporates his arguments from another motion to dismiss.  Id.  His argument is unconvincing for the same reasons I gave in my previous Report and Recommendation, doc. 1202 at 32–42.  As such, I incorporate by reference my prior analysis as if fully set forth here.

### 5.    *The August 11, 2021 petition.*

Bussey argues that the affidavit included misrepresentations and omitted information about a petition that Bussey filed on August 11, 2021.  According to the affidavit, Bussey filed an ETA 9142 application on behalf of Jennifer Rangel, requesting 80 workers for three worksites.  These included Jeff Davis Peanut & Grain, where workers would harvest peanuts and work in a peanut mill.  The other worksites included Rogers Farm and Morgan Farms, where workers would plant onions.  Doc. 694-3 at ¶ 224.  The application listed a Super 8 Motel in Douglas, Georgia, as the housing location for the workers.  Id.  I-129 Petition IOE8317835125 was filed on September 1, 2021, and approved on September 2, 2021.  Seventy-three workers entered the United States as a result.  Id.  Agents concluded from an interview with the owner of Jeff Davis Peanut & Grain that no workers ever showed up at that location.  The farmer stated that he called Bussey multiple times and Bussey informed him the workers would "be here tomorrow."  Id. ¶ 226.  No H-2A workers arrived at the farm.  Bussey states that the affidavit failed to describe a letter from Rangel approving the removal of Jeff Davis Peanut & Grain from the petition.  Doc. 694-6 at 2.  According to Bussey, this is why no workers ever showed.

Bussey has identified an omission related to the Rangel letter.  It is not a material omission, however.  As discussed above, there is evidence sufficient to support probable cause, even if the discussion of Petition IOE8317835125 were completely excised from the affidavit. In addition, Bussey underplays the other circumstances surrounding the application.  Bussey characterizes the farm owner, Archie Miller, as no more than a "long-time friend."  Doc. 694 at 14.  But the affidavit describes facts about Bussey's interaction with Miller that would raise suspicion.  According to the affidavit, Bussey encouraged Miller to use the H-2A program, Miller "contracted with Bussey" to obtain H-2A workers, and Bussey affirmatively and repeatedly represented to Miller that the workers would "be there tomorrow" before ceasing all telephonic contact.  Doc. 694-3 ¶ 226.  This demonstrates Bussey's significant level of involvement in the petition and his apparently false statements directly made in support of that petition.  Taken as a whole, then, the affidavit's representations demonstrate sufficient probable cause based on Petition IOE8317835125, even taking the Rangel letter into consideration.

The affidavit also states that no workers ever stayed at the Super 8 Motel listed on the original ETA 9142.  Bussey argues that "even the affidavit places this lapse solely on" Rangel, not Bussey.  Id. at 16–17.  Bussey argues the affidavit only describes conversations that the hotel manager had with Rangel and not conversations with Bussey.  This argument is unconvincing. First, Bussey has not identified an omission or misrepresentation.  He merely highlights information in the affidavit that he believes could have been construed in his favor.  That is not the inquiry in a Franks analysis.  Further, even if the affidavit had omitted this information, it would make little difference.  Bussey does not dispute that the ETA 9142 he filed on August 11, 2021, listed the Super 8 Motel as the workers' housing location.  It is also undisputed that 73 workers entered the United States based on this petition.  These facts would continue to support

probable cause, even if the affidavit included more detail about the Super 8 Motel. In addition, the affidavit's text shows that the hotel manager had contact with Jennifer Rangel. At most, this demonstrates that Rangel was the hotel manager's point of contact. It does not demonstrate that Bussey had no contact with the hotel manager or that Bussey was not involved in the scheme. Bussey has not shown an omission or misrepresentation for the Court to consider, and even if he had, the information at issue does not materially impact probable cause.

Ultimately, Bussey has not made a substantial showing that the challenged statements and omissions were essential to the probable cause determination. Even if the challenged statements in Agent Linemann's affidavit were corrected to address each of Bussey's particularized concerns, the affidavit would still support probable cause. Therefore, his Motion to Suppress and his request for a <u>Franks</u> hearing should be denied.[8]

Even considering all of Bussey's challenges together, and how all the challenges combined would impact the facts contained in the affidavit, Agent Linemann's affidavit would still support probable cause. To be clear, Defendant Bussey has made some valid challenges to inaccuracies within the affidavit. Bussey correctly points to issues with statements related to the agent certification standard, the omission of some of the CS's criminal history, and a few minor discrepancies in the affidavit's description of the August 20, 2019 meeting. Bussey has demonstrated an omission in the affidavit's discussion of his August 2021 petition. Even so, most of Bussey's challenges do not identify any material omissions or misrepresentations in the affidavit and, instead, merely ask for a better characterization of the evidence. Those challenges

---

[8]    I conducted a provisional <u>Franks</u> hearing on this Motion. Doc. 1133 at 77–195. It is not necessary to consider the evidence taken during the provisional <u>Franks</u> hearing. Bussey has not made a substantial showing that any challenged statement or omission was essential to probable cause. Any testimony showing agents acted recklessly or deliberately would not change this determination.

do not undermine probable cause.  Furthermore, the undisputed aspects of the affidavit show that Bussey had intimate knowledge of the TCO and its scheme to conduct H-2A visa fraud, had extensive contacts with members of the TCO and individuals in Mexico, articulated plans to engage in an H-2A visa scheme during recorded meetings with the CS, and filed several petitions investigators later determined to be fraudulent.  The affidavit's undisputed allegations show that Target Location 12 would likely contain evidence implicating various members of the TCO in the Target Offenses.  Thus, even considering all of Bussey's challenges together and in conjunction with all of the unchallenged statements, Bussey has not shown Agent Linemann's affidavit failed to establish probable cause.

## CONCLUSION

For the above-stated reasons, I **RECOMMEND** the Court **DENY** Bussey's request for a Franks hearing and **DENY** Bussey's Motion to Suppress the November 16, 2021 Search of 410 West 6th Street, Tifton, Georgia, and Computers and Electronic Devices.

Any objections to this Report and Recommendation shall be filed within 14 days of today's date.  Objections shall be specific and in writing.  Any objection that the Magistrate Judge failed to address a contention raised in the Complaint must be included.  Failure to file timely, written objections will bar any later challenge or review of the Magistrate Judge's factual findings and legal conclusions.  28 U.S.C. § 636(b)(1)(C); Harrigan v. Metro Dade Police Dep't Station #4, 977 F.3d 1185, 1192–93 (11th Cir. 2020).  To be clear, a party waives all rights to challenge the Magistrate Judge's factual findings and legal conclusions on appeal by failing to file timely, written objections.  Harrigan, 977 F.3d at 1192–93; 11th Cir. R. 3-1.  A copy of the objections must be served upon all other parties to the action.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a de novo determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge.  Objections not meeting the specificity requirement set out above will not be considered by a District Judge.  A party may not appeal a Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  Appeals may be made only from a final judgment entered by or at the direction of a District Judge.

**SO REPORTED and RECOMMENDED**, this 4th day of April, 2025.

BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA